Geraldine **HARRIS**, (Plaintiff) Respondent,

v.

**MOUND CITY YELLOW CAB COMPANY,**
a Corporation, and Albert Simms,
(Defendants) Appellants.

Nos. 31263, 31264.

St. Louis Court of Appeals.

Missouri.

April 16, 1963.

Motions to Set Aside Opinion, for Rehearing or to Transfer to Supreme Court Denied May 14, 1963.

Robert W. Henry, Clayton, for Mound City Yellow Cab Co., Louis A. Robertson, Ernest E. Baker, and Alexander & Robertson, St. Louis, for Albert Simms.

Morris A. Shenker and Frank B. Green, St. Louis, for respondent.

SAMUEL A. DEW, Special Commissioner.

Plaintiff, a married woman, 33 years of age, was injured in a collision between a taxicab in which she and her mother were riding as passengers, and another automobile. The accident occurred December 29, 1960, at the intersection of Union Boulevard and Washington Terrace in St. Louis, Missouri. The verdict of the jury was in plaintiff's favor against both defendants in the sum of $15,000. Both defendants separately appealed, and the appeals were argued, submitted and considered together.

The defendant-appellant Mound City Yellow Cab Company is hereinafter referred to as the "Cab Company", and defendant-appellant Albert Simms will be referred to as "defendant Simms".

Some of the facts are either admitted or, for the purposes of these appeals, stand uncontroverted. The plaintiff and her mother had boarded the Yellow Cab between 3:30 and 4:00 p. m. on the above date, plaintiff taking her seat in the rear and right side and her mother seated on the left and behind the driver. The cab was being operated by one William Arnall. As a part of the course of the cab it was being driven westward on Washington Avenue. When the cab reached Union Boulevard, a north and south-bound thoroughfare, the driver of the cab proceeded westward into and headed somewhat northwesterly across Union Boulevard, intending to enter Washington Terrace, which proceeds westwardly through a parked area, the entrance to which is slightly north of Washington Avenue east of the boulevard. Union Boulevard is 76 feet wide. There are no stop lights at the intersection of Washington Avenue and Union Boulevard, but there is a stop sign at the northeast corner thereof for use by traffic entering that boulevard from the east. The next street north of Washington Avenue to cross Union Boulevard is Delmar Street, 338 feet distant, where stop lights control the traffic at that intersection.

At Delmar and for a half block south on Union Boulevard, there are three lanes provided for southbound traffic, each about 10 feet wide. About the middle of that block the southbound lane next to the center line of the boulevard widens so as to provide two lanes, one for a continued course south across Washington Terrace, and one on the left for cars to be turned left into Washington Avenue and eastward. Thus, at the intersection in question, there are four southbound lanes. The southbound lane next to the center line of the boulevard is referred to as the "left turn lane" and the lane next to the west curb on Union Boulevard is referred to as the "curb lane". The streets were dry and level. There was no traffic control for northbound traffic approaching on Union Boulevard. The plaintiff and the defendant Cab Company contend that the collision took place in the "curb lane". Appellant Simms testified that it took place in the second lane from the west curb of Union Boulevard. The impact shoved the cab into the entrance to Washington Terrace and against a brick pillar on the north side.

In addition to the substance of the foregoing facts, plaintiff's petition alleged that the Yellow Cab was owned and operated by the Mound City Yellow Cab Company, a corporation, as a common carrier; that the cab was within that company's exclusive management, possession and control by its agent and in the course of his employment at the time and place in question; that the violent collision was "the direct and proximate result of the negligence and carelessness of said Mound City Yellow Cab Company, a corporation, and Albert Simms." On the part of defendant Simms the petition thereupon alleged numerous specific acts of negligence, to-wit: that he operated his car at a high and dangerous rate of speed under the conditions so as to endanger life and limbs of persons on or apt to be on said street; that he negligently failed to maintain a lookout ahead and laterally for persons and vehicles on said street, approaching or in the path of his vehicle, including the cab in which plaintiff was seated; that he carelessly and negligently operated his car in close and dangerous proximity to the cab in which plaintiff was riding when imminent danger existed; that he negligently failed to sound a signal or warning of his approach or proximity; failed to exercise the highest degree of care to discover the cab in time to stop, slacken the speed of, turn or to swerve his car so as to avoid the collision; that he negligently failed to have his car under such control as to have stopped upon the first approach of danger; that he saw, or in the exercise of the highest degree of care could have seen, the taxicab and the plaintiff in a position of imminent peril of collision with his car, and in time to have avoided the collision by stopping, slackening his speed, swerving his car, or sounding a warning, and that as a result of such negligence of the defendants, plaintiff sustained the injuries described.

By its separate answer defendant Cab Company admitted that one of its taxicabs was involved in a collision at the time and place alleged in plaintiff's petition, but generally denied all of the allegations as to her injuries and as to the negligence pleaded. In the course of the trial, however, appellant Cab Company admitted its ownership of the taxicab in question, and that the company operated as a common carrier. By his separate answer defendant Simms denied generally the controversial allegations of the petition.

The driver of the cab, Arnall, was a witness for the plaintiff. He testified that he brought his car to a stop, facing west at the stop sign at the northeast corner of Washington Avenue and Union Boulevard; that no traffic was approaching from the south and he started to cross Union Boulevard westward toward the entrance across the street to Washington Terrace; that a car on the "left turn" lane in Union Boulevard headed south, at or near the intersection, stopped and its driver motioned witness to proceed across in front of him; that witness proceeded to the next southbound lane where a driver of a car there signalled him

to proceed across; that he approached the second southbound lane where he was again motioned across by a driver of a car there; that he then "inched" along into the "curb lane" or the lane next to the west boundary of Union Boulevard at about five miles per hour. There he looked to the north and saw no approaching traffic and he then proceeded westwardly toward the entrance to Washington Terrace, and when he reached half way across the "curb lane" he looked again and saw a car about 60 feet distant coming toward him in that lane at about 45 miles per hour. The witness said he then applied his accelerator to five or ten miles per hour to avoid the collision and went about three feet when the Simms car ran into the rear side of the cab. He said Simms sounded no horn, but slackened his speed to about 25 miles per hour. The witness said he could have stopped the cab under the conditions within three feet with safety to himself and passengers. He said the impact forced the cab into the entrance to Washington Terrace and up against a brick "wall" there. Witness was knocked down and under his steering wheel. After the collision he got some one to call an ambulance. Shortly thereafter the plaintiff was taken to the hospital.

A patrolman on the scene testified to the conditions and situation of the vehicles after the collision. He described the cab as yellow and as having the words "Yellow Cab Company" printed on the side, and its number "230"; also a Board of Public Service "No. 130"; that he ascertained that the license number had been issued to William Arnall. The police photo in evidence also showed part of such printed sign on the side of the cab.

In her own behalf plaintiff testified that the first she knew of the impending collision was when the cab had reached the west side of Union Boulevard, when she glanced to the right and saw another car "on top of me"; that she heard no warning at all; that the force of the impact was terrific; that her leg "snapped" and she was jostled all over the cab, sustaining bruises on her right arm, and that her mother was bruised and her knee was cut. Plaintiff said she could see that her own right shin bone was broken and protruding, but not through the skin; that her foot was dangling from her ankle; and she was in extreme pain and agony. According to her testimony she was x-rayed at the hospital and at 7:00 p. m. her leg was first set, which took about one and one-half hours. A general anaesthetic could not be given her because she had so recently eaten her lunch. A local anaesthetic was administered. On January 4, there was another setting of the broken leg. In surgery two stainless steel screws were installed across the bone to hold the fragments together, and stitches were taken in the five-inch incision made. Her leg was then placed in a temporary cast. The swelling of her leg within the cast caused her great pain. She also developed a pain in her upper right side, which caused her to suffer severely when she breathed. The pain in her right side extended from her waistline to her right shoulder and chest. It was impossible for her to get comfortable either sitting up or lying down. She was given many shots of medication and drugs to relieve her constant suffering, and blood tests were made daily and sometimes oftener. She remained in the hospital about two months, most of which time she spent lying on her back. Pains developed in her lung and a full time practical nurse was engaged. At other times three nurses were in attendance.

Plaintiff further testified that after leaving the hospital she was not allowed to put any weight on her injured leg and in April a new cast was supplied her; that several doctors have attended her since, either at her home in Pittsburgh or at the home of her mother in St. Louis; that at St. Louis a new cast was furnished her reaching to her waist and with a heel, permitting her to walk with it. However, she said it was so heavy it had to be replaced with another in May. This, too, became too heavy, and a cast reaching below the

knee was adopted. Meanwhile the skin under the cast was peeling off and caused bleeding and tenderness. She then used a crutch for a while, then a cane and not until the fall of 1961 was she able to do without them. She continues to suffer pain, her knee is stiff and her ankle is smaller and she walks with a limp. After any exertion or when there is a change of weather, pains in her back and chest reoccur.

Dr. Milton Lenobel, a surgeon specializing in treatment and surgery of the musculo-skeleton system, testified for the plaintiff. According to his testimony he attended plaintiff after her accident. He said he found she "had a fracture involving the junction of the middle and lower third of the right tibia or shin bone and also a fracture involving the upper end of the fibula on the right side below the knee joint." He then performed a "closed reduction" operation on respondent's leg, inserting two stainless steel screws in the bone to hold the fragments together, and removed a loose fragment of the bone; placed a cast on the operated leg; later removed the sutures of the incision through an opening in the cast; later changed casts and finally advised use of crutches and cane. He described the plaintiff's limp and the development of a one-half inch of atrophy in the injured leg, due to long disuse. He said also plaintiff had a limitation in the ability to twist the right foot and ankle up and move the great toe of that foot. He said that in his opinion the conditions described were the result of the collision.

As to the question of permanency of plaintiff's condition, Dr. Lenobel testified that he could not tell how many of her present limitations would remain permanent; that he felt the atrophy of the right calf might improve with use, but for how long he could not say; that as to plaintiff's claim of pain he said her fractures were in an area of the bone that is slow to heal; that the tissue in the area was scarred due to both surgery and fracture; that there had been a destruction of tendons,

ligaments and blood vessels in the area, to what degree of permanency he could not tell, but he said that he felt that "this will not ever be a totally normal right leg". He stated that the screws should be left in the leg rather than to undergo another operation to remove them. On cross-examination he said plaintiff's gait, developed from such long use of the casts, might become permanent. When asked if he discovered a blood clot in plaintiff's injured leg, he said he could not see one with the cast on and would not have removed the cast to look for one, but he did feel that a blood clot had formed somewhere and caused an embolus of the lung.

Dr. Arthur E. Strauss, specialist in internal medicine and cardiology, testified in plaintiff's behalf. He said he was called to see plaintiff about two weeks after her accident to examine her for pains developed in her right lung and accompanying fever; that he found a pulmonary infarction due to embolism, which is a shutting off of the blood supply to an area due to a blood clot. He said he found a preliminary infarction or embolism which he believed came from a blood clot in plaintiff's injured leg; that she had given birth to a dead baby about six weeks before her accident and a consultation with a gynecologist was necessary to determine which might have caused the blood clot. He said x-rays taken January 11, 1962, showed scars of the lung tissue but which he said should not cause plaintiff further trouble.

Copious hospital records introduced in plaintiff's case noted plaintiff's pains and suffering, her moans and entreaties for pain-killing drugs for relief of pain and the extensive medication in her case. Mortality tables in evidence showed her life expectancy as 37.4 years.

In behalf of the Cab Company one Gary Cooper testified that at the time of the collision he was driving a car south on Union Boulevard in the first lane next to the center of that thoroughfare and saw the cab when it stopped on Washington Avenue

upon reaching Union Boulevard, and when it pulled out further and into the intersection; that the traffic was heavy, but not fast; that a couple of southbound cars stopped and let him by; that there was some traffic from the south; that the car in front of the witness stopped to let the cab go by; that the cab driver was looking both ways; that at that time there was no traffic in the "curb lane" on the west side of Union Boulevard. He said that when the cab was almost across the intersection he saw a big black Pontiac in the curb lane of Union Boulevard coming alongside of him and traveling about 35 miles per hour; that the driver of that car did not apply his brakes until he was "almost on the cab". Witness described the impact and the final location of the vehicles after the collision. He said he stopped, got out of his car, went to the wrecked cars where he saw plaintiff, whose leg was over the back of the front seat of the cab and appeared twisted, and that plaintiff seemed badly hurt. He then called the police.

Charles Morton was produced as a witness for the Cab Company. He testified that at the time of the collision he was driving a car south on Union Boulevard in the lane next to the "curb lane". According to his testimony he could see from Delmar the cab stop at Washington Avenue and start "inching" its way across the intersection; that he saw cars stop at the crossing to let the cab by; that after the cab had crossed the lane in which the witness was driving, the collision occurred in the "curb lane"; that he had noticed a car in that lane about two car lengths behind him; one car was in front of the witness. The car in the "curb lane" did not decrease its speed and was going about 35 miles per hour; that at the time of the collision the front end of the cab had almost reached the west curb of Union Boulevard. He described the impact of the two vehicles and their movements thereafter and the appearance of the cab and the plaintiff.

Counsel for defendant Cab Company read parts of the deposition of defendant Simms.

Simms therein had testified that he left Delmar, traveling about 28 miles per hour, and was 10 or 15 feet behind another southbound car; that he in fact was in the second lane from the west curb of Union Boulevard, and that the collision took place in that lane; that when he first saw the cab he was "right at it", and traveled about 8 feet before the impact with the cab, which had "speeded up"; that he could have stopped his car in 8 or 10 feet.

In his own behalf defendant Simms testified at the trial that as he approached the intersection of Union Boulevard and Washington Terrace, at the time of the accident, he was about 15 to 18 feet behind another car and going about 25 to 28 miles per hour; that he was traveling in the middle or second lane from the west curb of Union Boulevard; that some of the cars ahead of him went on across the intersection; that the car to his left had stopped; that when he first saw the cab it was coming across the witness' lane at about 15 to 20 miles per hour; that he "slammed" on his brakes and moved his car to the right to avoid a collision. He said he could have stopped his car within 45 feet. Witness denied that he had been traveling in the "curb lane".

Defendant Cab Company first complains of Instruction No. 8 given at the request of plaintiff. It read as follows:

"The Court instructs the jury that if you find from the evidence that the plaintiff, Geraldine Harris, was seated as a passenger in the rear seat of the Yellow taxicab mentioned in the evidence and that said taxicab was proceeding in a northwestwardly direction across Union Boulevard and heading toward the entrance gate to Washington Terrace and if you find that at said time, the defendant, Albert Simms, was driving his 1946 Pontiac automobile southwardly along Union Boulevard and in the curb lane for southbound traffic on Union Boulevard approaching Washington Terrace; and

if you find that at said time the defendant, Mound City Yellow Cab Company, by and through its driver, William E. Arnall, failed to drive the aforesaid taxicab in a careful and prudent manner and failed to exercise the highest degree of care in keeping a proper lookout in the direction in which he was operating said taxicab, and failed to keep a proper lookout ahead and to the north, or to the right for southbound vehicles in the southbound curb lane of Union Boulevard near the intersection of Union Boulevard and Washington Terrace, including Mr. Simms' automobile, if so, and if you find that such failure to keep a proper lookout was negligence, and that such negligence, if any, caused or contributed to cause a collision between said taxicab and Mr. Simms' automobile then you are instructed that your verdict should be in favor of plaintiff, Geraldine Harris, and against defendant, Mound City Yellow Cab Company, a Corporation."

■ The Cab Company's first objection to the above instruction is that it did not hypothesize the essential fact that the driver of the cab was at the time and place of the collision in the employ of that company or acting within the scope of any such employment. As stated, the Cab Company admitted in its answer that it was engaged in operating a system of taxicabs in St. Louis and, in the course of the trial, admitted its ownership of the cab in question, and that the company was authorized to operate it as a common carrier. Public records introduced verified such admissions, and witnesses and photographs tended to prove that the company's name and cab number were printed on the body of the cab. Under such evidence the plaintiff was not required to prove affirmatively that the driver was the company's agent and was acting within the scope of his employment. Fleischman v. Polar Wave Ice & Fuel Co., 148 Mo.App. 117, 127 S.W. 660; O'Malley v. Heman Const. Co., 255 Mo. 386, 164 S.W. 565, 566; Mann v. Stewart Sand Co., 211 Mo.App. 256, 243 S.W. 406.

■ The Cab Company next complains that the above instruction No. 8, in requiring the cab driver to maintain a proper lookout for other cars, omitted to submit the essential finding that the driver of the cab could have seen the approaching car, thus placing the absolute duty upon the cab driver to see the other car irrespective of his ability to see it, or whether the other car was where it could be seen. It is well settled that an instruction purporting to cover the entire case and to authorize a verdict must hypothesize all of the facts necessary for recovery. Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490, 491. Since Instruction No. 8 in the instant case required the jury to find affirmatively that the driver of the cab failed to keep a proper lookout for other vehicles, including that of defendant Simms, and that such failure was negligence and caused or contributed to cause the collision, such charge is equivalent to a requirement that the jury find that the cab driver could have seen the other vehicle if he had looked. Abernathy v. St. Louis Public Service Co., 362 Mo. 214, 240 S.W.2d 914, 920; See also Fortner v. St. Louis Public Service Co., Mo., 244 S.W.2d 10, 14.

Defendant Cab Company next raises the further point regarding plaintiff's said Instruction No. 8, to-wit, that as against that defendant the instruction submitted both general and specific negligence. The instruction as we have seen, having hypothesized the facts leading up to the collision between the cab and the car driven by defendant Simms, stated: "and if you find that at said time the defendant, Mound City Yellow Cab Company, by and through its driver, William E. Arnall, failed to drive the aforesaid taxicab in a careful and prudent manner and failed to exercise the highest degree of car in keeping a proper lookout in the direction in which he was operating said taxicab, and failed to keep a proper lookout ahead and to the north,

\* \* \* *and if you find that such failure to keep a proper lookout was negligence, and that such negligence, if any, caused* \* \* \*" *etc.* (Italics supplied). The petition alleged that the collision was the direct and proximate result "of the negligence and carelessness of the said defendant Mound City Yellow Cab Company, a corporation, and Albert Simms", and proceeded to charge defendant Simms with several specific acts of negligence. It is asserted by defendant Cab Company that such Instruction No. 8 thus submits to the jury the hypothesis that it failed to drive its cab in a careful and prudent manner (general negligence) and that its driver failed to keep a proper lookout (specific negligence).

 It is well settled that a charge of general negligence and one of specific negligence cannot both be submitted; that general negligence takes flight when specific negligence appears. Fuller v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 675, 678; State ex rel. Burger v. Trimble, 331 Mo. 748, 55 S.W.2d 422. However, it will be observed that the said instruction, while hypothesizing generally the cab driver's failure to drive his cab carefully and prudently (characterized by the Cab Company as an assignment of general negligence) it does not require the jury to find that such conduct was negligence or that it caused or contributed to cause the collision, but the *only* act of the cab driver submitted by the instruction *as negligence and as the cause or as contributing to the cause of the collision is the cab driver's failure to exercise the highest degree of care to keep a proper lookout.*

Defendant Cab Company cites and relies much on the case of Watson v. Long, Mo. App., 221 S.W.2d 967. In that case the instruction read: "and that defendant Brown failed to exercise the highest degree of care in operating said vehicle at said time and place and failed to maintain a vigilant watchout ahead of said automobile as it approached U. S. Highway 50 and drove said automobile at a high speed in said intersection \* \* \* and collided \* \* \* then said defendant Brown *was negligent,* and if you find that plaintiff \* \* \* was injured *as a direct result thereof,* then your verdict," etc. (Italics supplied). The court held the instruction erroneous and said, at page 969: "It is uniformly held error to submit both general negligence and specific negligence." (citing authorities). It will be noted in that case that each act of the driver Brown was conjunctively submitted to the jury *as negligence* and *as the direct cause* or contributing cause of the collision. The case of Watson v. Long, supra, is plainly distinguishable from the case at bar.

That the parties in the instant case construed and treated plaintiff's Instruction No. 8 to submit as to the Cab Company as negligence causing or contributing to cause the collision, its failure to maintain a proper lookout, is evident from the record. In the Cab Company's Instruction No. 9, it submitted the converse of the single assignment of its failure to maintain a proper lookout. In its Instruction No. 12, submitting as the sole cause of the collision the negligence of its co-defendant Simms, it admits that a finding against Simms upon the facts therein hypothesized, would require a further finding that the Cab Company itself was "not negligent as submitted in other instructions." In its sole cause Instruction No. 13, submitting the degree of care on defendant Simms' part to see the cab and to avoid the collision, the Cab Company conceded the necessity of finding itself not negligent "as set forth in other instructions herein", thus resubmitting the charge of negligence against it as contained in plaintiff's Instruction No. 8 and other instructions given in the case upon that point.

During the oral argument in the trial court, counsel for the Cab Company several times objected to statements of other counsel on the above subject, for instance: "I object to any argument against the Cab Company as to any facts other than we failed to keep a proper lookout; that is the only thing we are charged with here, failing to keep a lookout." Plaintiff's counsel,

also, argued that the Cab Company had reason to know the danger of crossing the boulevard and asserted that its driver had the duty "to see that as he crossed those lanes, there was nothing coming"; that failure to see was a failure to look; that "he failed to keep a lookout and as a result this collision occurred". Again counsel for the Cab Company said in his argument to the jury: "You know the only thing the Yellow Cab Company is charged with in this lawsuit and the only thing you can consider against the Yellow Cab Company is that it failed to keep a proper lookout. That's the only thing we are charged with. You are not to discuss anything else. The Court tells you, you are not to go outside these charges which have been made here. The only thing we are charged with, if you will read those instructions, is that we failed to keep a proper lookout; if.that man (the cab driver) just kept looking, if you believe he kept looking, your verdict shall be for the defendant Mound City Yellow Cab Company. You can stop right there. If you think he kept a lookout, if you think he did the best he could to look, you can stop right there as far as the Yellow Cab Company is concerned and bring in your verdict for us because that is all we are charged with." In its motion for a new trial, however, the Cab Company included as a ground therefor that plaintiff's Instruction No. 8 had erroneously submitted both general and specific negligence as against that defendant.

Even if the references in plaintiff's Instruction No. 8 to the cab driver's general careless and imprudent operation of the cab constituted a proper submission of general negligence, the Cab Company's right to complain of it is a different question. In Snelling v. Triplett, Mo.App., 171 S.W.2d 739, it was held that if the instruction therein did submit general negligence when specific negligence was shown, it was error. But the court held at page 741:

"Due to the manner in which the case was submitted to the jury by the instructions of both parties, whether Instruction No. 1 should be declared to be reversibly erroneous is another question. (Citing authorities), * * * the law is declared to be that if defendant joins in the error by asking and receiving counter instructions on general negligence, and there is no instruction submitting specific negligence, the error is waived. Defendant's instructions above set out make it clearly manifest that he joined in the manner in which the issue of negligence was presented to the jury by plaintiff's Instruction No. 1."

It was held that the defendant had waived the error.

In State ex rel. and to the use of Reeves v. Shain et al., Mo. en Banc., 343 Mo. 550, 122 S.W.2d 885, 887, the principle of waiver of objections to instructions is applied. It was said:

"Our judgment is that the petition in the case at bar charges general negligence; that the evidence tends to prove specific negligence, and that plaintiff's Instruction No. 1, in violation of above rule, erroneously submitted the case to the jury on general negligence. Defendant bus company joined in the error by asking and receiving counter instructions on general negligence. * * * the error * * * being common to both parties, the result would be the same whether our conclusion is right or wrong."

We find it difficult to believe that the court, jury or counsel, in considering the only complete submission of negligence on the Cab Company's part, in plaintiff's Instruction No. 8, namely, its failure to maintain a proper lookout, was misled or confused by the introductory references therein to the cab driver's general careless and imprudent operation of the cab. We believe that the mere preliminary submission of such general conduct on the part of the cab driver without requiring a finding that it constituted negligence and caused or contributed in causing the collision, may be

error, but if so, was harmless error, and, furthermore, was waived by the Cab Company as heretofore stated.

Defendant Cab Company next complains of plaintiff's instruction No. 11. That instruction told the jury that if the negligence of one defendant was less than that of the other, and if both contributed to the injuries, neither could use that fact to defeat recovery against both defendants. The Cab Company claims that the instruction permitted the jury to speculate on the degree of negligence. We construe the instruction to forbid the jury to consider degrees of negligence at all if they found the negligence of both concurred to cause or to contribute to cause the injuries. The point is overruled.

Defendant Cab Company makes the point that plaintiff's Instruction No. 16 erroneously allows recovery for permanent injuries where there was no substantial evidence to support such recovery. It will be recalled that one physician testified that "I feel that this will not ever be a totally normal right lower leg." There was also evidence of scaling of the tissue from both the fracture and the surgery; there was evidence of a limp, stiffness and atrophy of her ankle and foot, pain during cold and damp weather, and of other results, the permanency of which was uncertain. It cannot be ruled that there was no substantial evidence of permanency.

Defendant Cab Company claims error in the overruling of its objection to questions regarding the number of cabs it operated. Over the objection of that defendant, plaintiff's witness was allowed to state that permits had been issued to it to operate 250 cabs. This, it is claimed, was for the sole purpose of conveying to the jury the financial ability of the Cab Company. The petition put in issue the fact that the Cab Company was a common carrier, operating a system of taxicabs as such in the City and County of St. Louis, Missouri. The Cab Company admitted such fact in its answer. When testimony was made available by the plaintiff to prove those facts, the Cab Company then orally admitted its incorporation, ownership of the cab, and that the company was a common carrier; but plaintiff nevertheless introduced evidence in support thereof, claiming that it was not bound by the admissions made. See Ruppel v. Clayes, 230 Mo.App. 699, 72 S.W.2d 833. The number of cabs so operated as a "system" in the city and county named was a related matter and not prejudicially erroneous.

Defendant Cab Company's next point relied on is that the court erred in overruling its objection to plaintiff's witness Dr. Strauss' testimony that plaintiff was put on the critical list at the hospital as soon as the diagnosis of pulmonary infarction was made " * * * because there was potential danger of death. She fortunately did not die." It is said that such testimony was irrelevant, immaterial, and prejudicial. The physician was testifying as to the blood clot found to exist in plaintiff's lung, and explaining the nature and serious effects thereof. By way of explanation he described the shortness of breath accompanying such condition and significant signs of danger. In relating his treatment, he then said he first placed plaintiff on the critical list "because of the potential danger of death." The fact that plaintiff did not die and later recovered from her lung involvement, would not, in our opinion, transform the doctor's statement, as the Cab Company contends, into one confusing the issues and unfairly surprising the defendant Cab Company to its prejudice.

Finally, defendant Cab Company claims error in the court's overruling its objection to plaintiff's introduction of a mortality table to show her life expectancy. It is argued that such evidence is immaterial and irrelevant, and is usually admissible only when impairment of earning capacity is pleaded. It is admitted that no authority covering the point has been found available. Having pleaded the injuries, the past, present, and future pain and suffering, anguish

of mind, past and future medical care and surgical attention; and having proved permanency as to some of the injuries; it was incumbent upon the plaintiff to produce "evidence of their existence and extent, and some data from which they may be computed." Lee v. Armour Bldg. Co., Mo.App., 18 S.W.2d 102, 105; 25 C.J.S. Damages § 28, page 496. We believe that under all the circumstances of record, we cannot rule that plaintiff's normal life expectancy was irrelevant or that it had no probative value in the determination of the nature, extent, and duration of the damages sustained.

Defendant Simms, in his separate appeal, first attacks the plaintiff's Instruction No. 11. As stated, that instruction directed the jury as to the effect of concurrent negligence of the defendants causing or contributing to cause the collision. It stated that "if both defendants were negligent in any respect submitted to you in these instructions," which caused or contributed to cause plaintiff's injuries, then neither defendant, if less negligent than the other, could make use of the concurring negligence to defeat plaintiff's claim against both. In plaintiff's verdict-directing Instruction No. 10, as against defendant Simms, she had charged him only with failure to keep a proper lookout, although in her petition she had pleaded, among other assignments of negligence, excessive speed and failure to see the cab or to use the highest degree of care to see it. Thus, the defendant Simms claims plaintiff abandoned all charges of negligence against him except failure to maintain a proper lookout. He maintains, however, that by the quoted words in plaintiff's said Instruction No. 11, he was charged with additional negligence submitted in defendant Cab Company's two sole cause instructions assigning against Simms excessive speed and failure to exercise the highest degree of care to see the impending danger of collision, and thus to have stopped or slowed his car and thereby avoided the collision. As to these two additional charges of negligence, defendant Simms asserts that they were abandoned by the plaintiff, and are inconsistent and prejudicial to him.

Defendant Simms in his own verdict directing sole cause Instruction No. 14, hypothesized as the sole cause of the collision the fact that the cab driver operated his cab at a dangerous proximity to the southbound car of Simms when such driver saw, or in the exercise of the highest degree of care he could have seen, the danger of collision so as to have avoided the same, and sought a finding to that effect, provided that *"said injuries, if any, were not due to any negligence on the part of Albert Simms as set out in other instructions herein."* (Italics supplied). Thus by inviting the jury's consideration of "any negligence" on his part "as set forth in other instructions herein," he is in no position to urge that plaintiff's Instruction No. 11 does the same thing (if it does), nor that the assignments of negligence in dispute were abandoned. The rule is well settled that one party may not complain or take advantage of erroneous instructions given at the request of his adversary if his own instructions contain the same objectionable matter. The error complained of, if it be error, has been waived. Jewell v. Arnett, Mo., 318 S.W.2d 277, 279; Bowers v. Etherton, Mo., 216 S.W.2d 83, 87; Wilson v. Northwestern Electric Power Cooperative, Mo.App., 301 S.W.2d 882. The defendant Simms point 1(a), (b), (c) is accordingly overruled.

Both defendants urge that the verdict is excessive. It would serve no purpose to review in detail the extensive record of the plaintiff's injuries and damages as shown by her evidence and hereinbefore described. Reviewing it generally, we consider the extreme pain and suffering both from the fracture and the surgery; the confinement of two months in the hospital; the severity of the treatments, the wearing of the casts and their effect upon the injured limb; the limitations of use of the leg, ankle and foot; the blood clot experience and consequent lung affliction; the permanency of some of the injuries, and other specifica-

tions of damages. In the opinion of the jury and judge of the trial court the amount of the verdict was deemed proper. We find nothing in the record to support a contrary ruling.

Finding no error substantially affecting the merits of the case, we conclude that the judgment of the trial court should be affirmed. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by Judge DEW, Special Commissioner, is adopted as the opinion of the Court.

The judgment of the circuit court is accordingly affirmed.

RUDDY, P. J., and WOLFE and ANDERSON, JJ., concur.