Ernest COFFMAN, a Minor, by His Next Friend, Paul Coffman, Plaintiff-Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Defendant-Appellant.

No. 49976.

Supreme Court of Missouri,

Division No. 2.

April 13, 1964.

Opinion Modified on Court's Own Motion May 11, 1964.

Motion for Rehearing or Modification of Opinion Denied May 11, 1964.

Norris H. Allen, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for defendant-appellant.

Thompson, Walther & Shewmaker, Harold C. Gaebe, Jr., Richard D. Shewmaker, St. Louis, for respondent.

PAUL VAN OSDOL, Special Commissioner.

Plaintiff Ernest Coffman had verdict and judgment for $270,000 against St. Louis-San Francisco Railway Company, hereinafter frequently referred to as "Frisco," and James Waterman, defendants, for personal injuries sustained by plaintiff at about eight thirty in the evening of November 27, 1961, when the 1959 Pontiac station wagon, northbound on Rolla Street, in which automobile plaintiff was a passenger and which was driven by defendant James Waterman, was struck by defendant Frisco's westbound freight train at Frisco's grade crossing at and through the irregular intersection of Rolla Street and 4th Street in the city of Rolla.

The defendants filed their separate notices of appeal; but defendant James Waterman has filed herein his voluntary dismissal, and this court by order has dismissed his appeal.

Herein, defendant Frisco contends errors of the trial court (1) in failing to direct a verdict for defendant Frisco and in giving plaintiff's verdict-directing Instruction No. 1, submitting plaintiff's case to the jury. Frisco asserts plaintiff failed to make a submissible case on his *one* theory of submission. Also, Frisco contends other errors of the trial court (2a and 2b) in instructing the jury; and Frisco further contends (3) the amount of the jury's award was excessive.

Plaintiff's case against Frisco was submitted on the theory the Frisco grade crossing was unusually dangerous and hazardous because the crossing (it was submitted) was heavily traveled; the view of the motorist, traveling northwardly along Rolla Street, was obstructed and confusing toward the northeast due to abrupt change of grade elevation of the crossing above the street, and the location of buildings, trees, bushes, lights and other physical conditions; and that, because of such unusually dangerous conditions, Frisco, in the

exercise of ordinary care, should have provided a flasher signal, bells, watchman, or some other means or device at the crossing to warn the public traveling northwardly on Rolla Street of the westbound movement of trains.

(1) In Homan v. Missouri Pacific R. R. Co., 334 Mo. 61, 64 S.W.2d 617, at pages 622–623, this court examined and quoted from the leading case of Grand Trunk R. Co. v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485, and examined numerous other authorities in reviewing the question of the submissibility of plaintiff Homan's case against the railroad company. The principles this court recognized and applied in determining the submissibility of plaintiff Homan's case supply guidance for us in determining the instant question of the submissibility of plaintiff Coffman's case against Frisco.

 Generally stated it is said that where a much traveled railroad crossing is, for any reason, particularly dangerous, it is a question for the jury whether the ordinary care required of a railroad company to guard against accidents at its crossings imposes on the railroad company the duty to take some extraordinary and commensurate precautionary measure or measures such as, for example, stationing a flagman at the crossing. Numerous facts, circumstances, and conditions may be considered on the initial factual question—was the crossing unusually dangerous and hazardous? On this issue, there may be shown supporting evidential facts, circumstances and physical conditions such as the location of the crossing in an urban area; the shown objects which may obscure the highway traveler's view; the extent of the use of the crossing by the traveling public; or, we here add, the physical construction and condition of the crossing itself, or the curvature of the track at and approaching the crossing. These facts, circumstances and physical conditions, or one of them, or two or more of them in combination, reasonably supported by evidence, as well

as other facts conceivably relevant in some given case, may be considered by the jury and found by the jury to be decisive of the issue. And whether in a given case the facts in evidence are such as would mark a particular crossing as one attended by unusual danger is a question solely for the jury, unless only one conclusion may be drawn therefrom by all reasonable minds. See also 24 A.L.R.2d 1163.

And see the more recent case of Jenkins v. Wabash R. Co., Mo.Sup., 322 S.W. 2d 788, in which case this court recognized the shown factual factors peculiar in the circumstances and conditions of the rural but frequently traveled grade crossing involved in that case, and which facts, circumstances and conditions were held to be sufficient for the jury to consider and determine unusual danger inhering, and to infer negligence of the railroad company in failing to take the commensurate precaution of passing over the crossing at a reasonable rate of speed.

In treating with the question of the submissibility of plaintiff Coffman's theory of submission in the instant case, we think it necessary to make an extended statement of the evidence.

The city of Rolla is the county seat of Phelps County. It is a "school town," the Missouri School of Mines and Metallurgy being located there. A witness estimated the city's population is about 18,000 including the students attending the school of mines.

U. S. Highway 66 (interstate route) passes along and partially through the northwesterly side of Rolla. U. S. Highway 66, city route, passes through the northwestern portion of the city. U. S. Highway 63 passes through Rolla in a general but irregular north-south direction. And State Highway 72, coming from the southeast, passes through the southeasterly part of the city, and intersects north-south Rolla Street approximately six blocks south of the railroad grade crossing involved in this case.

Frisco's main line, westwardly from St. Louis to Springfield and to points farther west, approaches the city of Rolla from the northeast and passes through the northern part of the city and the southeastern part of "downtown Rolla."

The downtown or commercial district of Rolla is substantially bounded by 11th Street on the north; by 6th Street on the south; by Elm street on the east; and by Rolla Street (two blocks west of Elm) on the west. Rolla Street between 11th and 6th is a one-way southbound street. And Rolla is a two-way street from 6th Street southwardly. The city engineer of Rolla testified that Rolla Street is one of the major streets of the city. It extends from the southerly city limits northwardly to and along the west side of the business district. It collects the traffic in the south part of Rolla, except that collected by U. S. Highway 63, which also extends from the south. The Phelps County courthouse is on the west side of Rolla Street in the second block south of the crossing; and there is a new shopping center on the north side of State Highway 72 between Rolla Street and U. S. Highway 63. The shortest route for vehicular traffic between the new shopping center and "downtown Rolla" is Rolla Street. Fifteen to twenty percent of the population of the city reside in this general southwesterly area.

Two streets to the westward of Rolla Street—Main Street, one block west, and Park Street, two blocks west—pass over Frisco's track—Main Street by way of a wooden bridge, and Park Street by way of a grade crossing. However, these two streets, Main and Park, do not extend southwardly from 1st Street. There is an underpass at U. S. Highway 63 three or four blocks west of Park.

According to a traffic survey in 1956, the average daily flow of traffic on Rolla Street across the Frisco crossing was 2,000; in 1959 it was 2,400 "plus or minus," and a more recent twenty-four-hour traffic count indicated 2,538 vehicles. A witness, a for-

mer policeman, with several years' experience in cruising the streets of the city, testified that Rolla Street is the most heavily traveled street in Rolla.

Frisco operates ten or twelve or more trains over the crossing daily; and occasionally there are switching movements over the crossing in order to spot freight cars on sidings adjacent to commercial buildings to the northeastward on either side of the right-of-way north of 6th.

In approaching and passing over 6th Street from the northeast, westbound Frisco trains emerge from between commercial buildings on the north side of 6th and then move over the track as it curves more to the right, that is more westwardly, for the distance of 584 feet to Rolla Street. The curvature of the track continues as the track diagonally passes through the irregular intersection of 4th and Rolla, thence through a cut and under the wooden bridge at Main, one block west of Rolla Street. The degree of curvature, mathematically, was not shown in evidence; however, aerial and other photographs and plats indicate that, if a straight line were aligned with the practically straight track north of 6th and projected southwestwardly in like alignment, such projected tangent to the left of the curve south of 6th would point to the Phelps County courthouse on the west side of Rolla Street in the second block south of the crossing.

Measured in the northeast quadrant, the angle of the intersection of Rolla Street and Frisco's tract at the crossing is forty-nine degrees and thirty-one minutes. In this northeast quadrant there is a standard cross-arm railroad crossing sign approximately ten feet east of the street and sixteen feet north of the center of the track.

Telegraph poles, north of the track, that is, inside the curve, generally are in curvature parallel with the curve of the track; and a small "telephone call" shanty is "inside" the curve. The shanty is about twelve feet north of the north rail and

approximately two hundred sixty feet from the east side of Rolla Street at the crossing.

As indicated supra, the intersection of 4th and Rolla Streets is irregular. 4th Street intersects the east side of Rolla Street about sixty-five feet *south* of the crossing, and there's a "jog in there." The normally straight east-west 4th Street continues southwestwardly for some distance from the west side of Rolla Street *north* of the crossing.

South of the Frisco track and east of Rolla Street there is a triangular area of substantially lower elevation than that of the track. The area is bounded by 4th Street on the south; and by north-south Pine Street on the east (Pine is one block east of Rolla). There are residences and other one-story frame buildings, nine of them, in this area; also, there are trees, brush and other vegetation, defoliated, of course, in late November.

(See the reproduction of Frisco's Exhibit G, which exhibit reflects a view in a northeasterly direction. The picture was taken November 28, 1961, with the camera twenty-five feet west of the west curb of Rolla and sixty feet south of the south rail of the track.)

Frisco's Exhibit G

The motorist, northbound on Rolla, passes the Phelps County courthouse on his left; crosses 3rd Street; and then a one-story office building on his right at the southeast corner of the intersection of 4th and Rolla. The office building, sometimes referred to by the witnesses as the "Lawyers Building," is eighty feet long (north-south). The north end of the building is four feet north of the point of lowest elevation of the grade of Rolla Street in the motorist's northbound approach. From this point of lowest elevation it is said to be eighty-four feet to the south rail of the track, measured along the center line of Rolla, in which distance the grade of the street increases in elevation slightly more than four feet; however, slightly more than three feet of such increase of grade is within the distance of *forty-six feet* from the south rail. The south rail of the track is five inches higher than the north rail; the elevation declines one foot in eleven feet northwardly from the point of highest elevation south of the south rail; and the elevation declines three feet in forty-four feet northwardly from the point of highest elevation south of the south rail.

James Waterman, driving the Pontiac, was proceeding northwardly on Rolla in the evening of November 27th. It was cold and dark, although the general weather condition was fair. Five other young people, passengers, were in the car, including plaintiff Ernest Coffman, schoolmate and friend of James. Ernest was seated on the right in the rear seat. Rose Waterman, sister of James, was seated immediately to the left of Ernest. Rose's college friend, Carol Abate, was seated in the front seat to the right of James, the driver.

Plaintiff Ernest testified that James had been driving the Pontiac at a speed of twenty to twenty-five miles an hour. James started to slacken speed when the car was about a block and a half away from the track.

As the car was passing the Lawyers Building, plaintiff looked to his right, but "only in a glancing manner." There were trees and shrubs up there (Frisco's Exhibit G). As he "looked up there," he didn't see a light or anything "that he could distinguish as a train." The automobile was moving at its slowest speed where "the steepest incline starts toward the track." Plaintiff again looked to the right only "when Carol called out. - - - Something to the effect that there was a train on the track." Plaintiff looked up and saw a light - - - "Nothing but a train on top of me." He said, "Look out Rosie," and turned and pushed her to the floor.

The fact is the leading diesel unit, No. 5212, of Frisco's westbound freight train struck the right rear section of the Pontiac.

The train was comprised of seventy-two freight cars. The train, moving thirty-six miles per hour, was drawn by five diesel units. The leading unit (No. 5212) was equipped with a fixed headlight with reflector fourteen inches in diameter, the center of which headlight being nine and a half feet above the rails.

Witnesses for Frisco said the headlight of diesel No. 5212 was 475,000 beam candle power, as compared or contrasted with the 30,000 beam candle power of the sealed beam of an automobile headlight. The fourteen-inch headlight is "to some degree" a spotlight; the beam is restricted to a seven and a half degree "beam spread," horizontal and vertical. If you were going around a curve, the light would be shining straight ahead of you. It wouldn't be following the track around. (See Frisco's Exhibit B-1, reproduction of a nighttime picture taken September 30, 1962, showing diesel No. 5212 stopped at 6th Street, 584 feet northeast of Rolla Street—camera lens *four feet two inches above the pavement*, the camera being eight feet nine inches west of the east curb of Rolla and fifty feet south of the south rail of the Frisco track at the crossing.)

590

Diesel unit No. 5212 was not equipped with an additional "oscillating" light as are some other of Frisco's diesels, which oscillating light is primarily for warning, "to attract attention." As the diesel unit No. 5212 is passing around a curved track the beam of the fixed headlight "Would be changing position constantly." One witness for Frisco said he didn't know the degree of the curvature of the track between 6th and the crossing, but the light of the diesel "just swoops right around."

Frisco argues in its brief the evidence introduced not only doesn't justify a finding that the crossing was unusually dangerous but the physical facts indubitably established by photographs introduced in evidence show beyond any question of a doubt that the crossing under the conditions the northbound motorist on Rolla encounters are not only not unusually dangerous but the vision of the oncoming train was more than ordinarily apparent "by virtue of the physical layout, with the train coming from the right" at an obtuse angle, that is, from the northeast of the motorist's northbound approach. It is argued that Frisco's train high above the elevation of the motorist's approach, was to be plainly seen, this, without the possibility of a doubt; especially so at nighttime when the powerfully illuminating beam of the headlight of the locomotive would be shining "right at the automobile."

In this connection, Frisco cites and principally relies upon Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, which we put aside as not helpful to us here. This, for the reasons the case in part turned upon the failure of the plaintiff to sustain her submission against the railroad company. The submission was that a grease shack, to the westward of the crossing and north of the track, so obstructed and continued to obstruct the vision of plaintiff's decedent, southbound on Ava Avenue, until decedent's truck *was on the north rail of the track.* Sight distances to the west of the southbound motorist's approach to the crossing, conclusively shown by photo-

graphs and actual measurements, beyond doubt refuted plaintiff's theory of submission and so the "negligence per se" of plaintiff's decedent, *the driver of the truck,* was the proximate cause of his own fatal injury.

We shall treat with Frisco's argument supra by saying we think a jury reasonably could have believed from the evidence that the (daytime) northeasterly view of the motorist in the shown "layout" (that is, the motorist was on a street through an area of substantially lower elevation than that of the track) is reduced, obscured and affected by physical objects such as buildings, trees and shrubs and by objects northward of and within the curvature of the track until the motorist's vehicle has progressed to a near approach of the crossing. Frisco's Exhibit G.

And as to the motorist's nighttime view— we think a jury reasonably could have believed that the central cone of light projected by the locomotive's fixed headlight of limited beam spread, at the time the locomotive was passing over 6th (because of the contour of the terrain and the curvature of the track) was momentarily shining in the direction of some point on Rolla four or five hundred feet south of the crossing; and that the lesser glow of illumination, lateral to the central cone of light, was confusingly blended with the background glow of the nighttime illumination of the downtown Rolla and confusingly diffused by the buildings, trees and shrubs to the right of the motorist's approach and by objects northward of and within the curvature of the track. Frisco's Exhibit B–1. And this, until the central cone of the headlight, as the locomotive progressed around the curve (the beam of the headlight constantly changing direction) "swooped" around and directly illuminated the motorist's near approach to the crossing.

Even though a jury might believe, as a jury certainly with reason could, that the northbound motorist in the near approach of the crossing, in the exercise of the high-

est degree of care, could have plainly seen the oncoming train in ample time to have stopped his vehicle in safety south of the crossing, nevertheless, the physical objects to the right of the northbound motorist's approach and in the north inside curvature of the track; the contour of the terrain; and the illuminating play of lights and in whatever obscuring or confusing effect in affecting the safety of the railroad crossing a jury might believe them to have been, were for the jury to consider together with "the other facts, circumstances and physical conditions" in evidence in this case.

In this case, an action instituted by plaintiff, a passenger in the automobile involved in the casualty at the alleged unusually dangerous railroad crossing, against defendant railroad company, it would be erroneous for us, in reviewing the question of the submissibility of plaintiff's case against the railroad company, to become decisively preoccupied with particular sight distances from particular points of view of the driver of the automobile as the northbound vehicle approached the crossing, as if we were reviewing a defendant railroad company's contention that a plaintiff driver of an automobile was, as a matter of law, guilty of contributory negligence in failing to look out.

It would not be especially useful for us to discuss in detail the evidence, stated supra in our statement of the evidence, which evidence was substantial in tending to show other facts, circumstances and physical conditions giving evidentiary support on the issue of an unusually dangerous railroad crossing.

In speaking of the "other facts, circumstances and physical conditions" we mean, for examples, the track's angling and diagonal passage through the crossing at and in the irregular intersection of 4th and Rolla; the northbound motorist's driving problems in approaching the heavily traveled, rather uneven and "upgrade" crossing, the while requiring his careful observation to

the right oblique for westbound, and acutely back to the left for eastbound trains, and to the northward for motor vehicles moving southwardly on Rolla, and eastbound motor vehicles on 4th "jogging" southwardly in immediately approaching the crossing; the "setting" of the crossing in the near-central area and within three blocks of the downtown commercial district of a city of several thousand population; and the absence of any warning installation at the crossing other than the "cross-buck" railroad crossing sign such as one may see at ordinarily dangerous infrequently traveled railroad grade crossings with settings in sparsely populated rural areas.

■ We hold the trial court did not err in failing to direct a verdict for Frisco, and did not err in giving the Instruction No. 1 submitting plaintiff's theory of recovery, as submitted, to the jury.

(2a) Frisco assigns error of the trial court in giving plaintiff's concurring negligence Instruction No. 3, which instruction in part was as follows:

"The Court instructs the jury that if you find from the evidence *and other instructions of the Court* that defendant Frisco was negligent and that defendant James Waterman was negligent _ _ _ then your verdict should be in favor of the plaintiff Ernest Coffman and against both defendants, because if both defendants were negligent *as submitted to you in the other instructions* of the Court, and if their negligence directly contributed to cause the collision _ _ _."

It is contended that the clauses we have italicized may well have misled and confused the jury into believing a verdict was authorized for plaintiff against Frisco on a finding of negligence hypothesized in defendant Waterman's sole cause Instructions Nos. 11 and 12 which hypothesis of sole cause negligence of Frisco in Instruction No. 11 was negligence of Frisco in failing "to sound the horn on said locomotive,"

and, in Instruction No. 12 was negligence of Frisco in moving its train "at the rate of 36 Miles per hour."

Frisco reminds us that plaintiff in his petition had alleged, inter alia, negligence of Frisco in failing to "sound a horn or whistle on said locomotive," and in operating its locomotive and train "at a rate of speed that was then and there high, excessive and dangerous;" and that plaintiff had introduced evidence tending to support these averments, but chose not to submit his case against Frisco on such theories of Frisco's liability, and submitted his case on the single theory of Frisco's liability as hypothesized and submitted in his verdict-directing Instruction No. 1. Parenthetically, we note plaintiff submitted his case against defendant Waterman in plaintiff's verdict-directing Instruction No. 2, hypothesizing negligence of that defendant in failing to keep "a careful lookout ahead and to his right."

Frisco would concede that Instructions Nos. 1, 2, and 3, considered together are not in any way misleading; but, argues Frisco, due to an inadvertence of counsel and the trial judge in their hurried preparation of instructions at the conclusion of the trial proper, in failing to notice the "poison" injected by the giving of defendant Waterman's sole cause Instructions (Nos. 11 and 12) in the incidence of the giving of plaintiff's concurring negligence Instruction No. 3; or, conversely, the giving of the Instruction No. 3 in the incidence of the giving of Instructions Nos. 11 and 12, injected prejudicial error in instructing the jury in this case. Principally, Frisco relies upon Yates v. Manchester, 358 Mo. 894, 217 S.W.2d 541.

In the Yates case, plaintiff's instruction 3 advised the jury that, if the jury believed "that both the defendants (Manchester and Mitchell) were negligent in the manner and form set forth in other instruction," and that their negligence concurred in causing plaintiff's injuries, the verdict was to be for plaintiff and against both defendants. The

instruction 3 was held erroneous, because, when read together with defendant Manchester's (erroneous) instruction 6, the jury might have been misled and confused into believing the jury was authorized to return a verdict for plaintiff against defendant Mitchell for the sole cause negligence of defendant Mitchell submitted in instruction 6, some of the hypotheses of specific negligence submitted as sole cause negligence of defendant Mitchell not having been pleaded by plaintiff; and, because the instruction 6 did not submit facts sufficient to guide the jury in determining the issues of negligence submitted. We think the Yates case does not govern our decision here.

In further examination of the given instructions in the instant case, it is at once, of course, noticed that the sole cause Instructions Nos. 11 and 12 did not direct a verdict for plaintiff; they authorized a verdict for defendant Waterman and against plaintiff. And the only instruction specifically submitting plaintiff's case against Frisco and directing a verdict for plaintiff and against Frisco was plaintiff's Instruction No. 1; also, we have read defendant Frisco's Instruction No. 4, which hypothesized the converse of the facts hypothesized and submitted in plaintiff's Instruction No. 1, and told the jury, in effect, that if the (converse) facts were as submitted in the instruction (No. 4) "your verdict will be in favor of the defendant St. Louis-San Francisco Railway Company."

■■ Closely reading together the several instructions thus far mentioned, we have come to the belief that a jury of average intelligence and discernment would not be led astray as Frisco contends. However, if, perchance, we are mistaken, then we should give regard to and consider defendant Frisco's Instruction No. 5 which submitted the sole cause negligence of defendant Waterman in failing to keep a careful lookout ahead and to his right, which instruction in part was as follows:

"The Court instructs the jury that if you find and believe from the evi-

dence that as the automobile in which plaintiff was a passenger approached the intersection _ _ _ and if you further find that defendant James Waterman failed to keep a careful lookout ahead and to his right _ _ _ and was negligent, and that such negligence, if you so find, was the sole cause of the collision . . . and if you further find that the defendant St. Louis-San Francisco Railway Company was not guilty of any negligence, *as submitted in the other instructions given you herewith,* . . .."

So Frisco really is not in a position to complain of the asserted error in giving Instruction No. 3, including the italicized clauses in that instruction, inasmuch as defendant Frisco's Instruction No. 5 included, in effect, the same assertedly objectionable language. The St. Louis Court of Appeals addressed itself to the almost identical situation in the instructions given in Harris v. Mound City Yellow Cab Company, Mo. App., 367 S.W.2d 43, and at page 54, correctly solved the problem by saying, "The error complained of, if it be error, has been waived."

(2b) Frisco contends error of the trial court in giving plaintiff's measure of damages Instruction No. 17, particularly paragraph Fourth thereof, which paragraph is as follows:

"Fourth, such permanent impairment, if any, or destruction, if any, of Ernest Coffman's earning capacity after his twenty-first birthday as you find from the evidence Ernest Coffman has suffered as a direct result of such occurrence, *considering how long he would probably have lived* (as found by you from the evidence) *if he had not been injured."*

It is argued the emphasized language is contrary to the public policy of this state with respect to the limitation of the amount, $25,000, of awards in actions under the wrongful death statute. Says Frisco, the evidence introduced in this case shows plaintiff has a very limited life expectancy. And Frisco in its brief herein correctly states evidence tending to show that the injuries suffered by plaintiff were, in nature and extent, of the most severe, painful and permanently and totally disabling character.

It is sufficient here, at this point, to notice that as a result of the casualty plaintiff suffered injury to the cervical spine which brought about a physical condition which may be termed (near) "quadraplegia."

Now, says Frisco, "From the evidence in this case it is obvious that in all likelihood the unfortunate plaintiff will not be alive in 1970. What sense is there in awarding Ernest Coffman an amount equal to his earning capacity in 1971 when he won't need it?" So it seems Frisco means the element of damages—impairment (or destruction) of earning capacity, or loss of earnings—should not be determined by a jury by considering how long Ernest Coffman probably would have lived "had he not been injured." Rather, in effect, says Frisco, the stated element should be determined by considering how long Ernest Coffman (a quadraplegic because of Frisco's wrong) probably will live in his physical condition now after the injury.

It is pertinent to here emphasize the indisputable fact that plaintiff Ernest Coffman *has survived the rendition of the instant judgment* in his favor.

(Plaintiff's action on his common law right of action to recover for his own personal injury is different from the "new in species," statutory right of action in decedents' beneficiaries created by the wrongful death statute. Consult Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S.W.2d 920. And we regard Frisco's reference to the wrongful death statute as irrelevant.)

Even if plaintiff were to die during the pendency of this appeal from causes for which Frisco was not responsible, the instant judgment, if affirmed, would stand. Dempsey v. Thompson, 363 Mo. 339, 251

S.W.2d 42. This we would suppose is because all claim for defendant's wrong was merged in, and the amount of recovery fixed and determined by the instant judgment for plaintiff rendered in his lifetime and a fatal cast of events subsequent to the rendition of the judgment could have no modifying consequence. See Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691, at pages 696–697.

In the case of Adelsberger v. Sheehy, 336 Mo. 497, 79 S.W.2d 109, cited and relied upon by Frisco, the judgment for Adelsberger, rendered in his lifetime, *was reversed*. Adelsberger had died, pending the appeal, *of causes for which Sheehy was not responsible*. In the action carried on by Adelsberger's administratrix, loss of earnings correctly could be recoverable only as measured to the time of Adelsberger's death.

In Prairie Creek Coal Mining Co. v. Kittrell, 106 Ark. 138, 153 S.W. 89, appellee Kittrell had suffered a broken back and was paralyzed from the hips down. The trial court had instructed the jury to determine loss of earnings "according to what you find his probable life expectancy if he had not received the injury complained of . . .." Said the Supreme Court of Arkansas,

> "The appellant contends that appellee should not recover for the full expectancy of his life before the injury occurred, when the evidence shows that, by reason of the injury, he will not live more than six months. The appellee had a right of action against appellant, as soon as the injury occurred, for all damages he had sustained, caused by the negligence of appellant. The true measure for loss of earning power is the present value of these damages during the expectancy of appellee's life, had the injury not occurred. By reason of the injury, appellee was rendered a helpless and hopeless paralytic, with a total loss of earning power for the full period of his expectancy. Certainly this is one element of his damages."

■ It has been written that the "extent of future harm to the earning capacity of the injured person is measured by the difference viewed as of the time of trial between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm. This difference is the resultant derived from reducing to present value the anticipated losses of earnings during the period of the prospective life the plaintiff would have had but for the defendant's act." Comment d, on Clause (b), Restatement, Torts, § 924. Of course, substantial authority supports this, and contra authority is distinguishable. See the law review article, "Life Expectancy and Loss of Earning Capacity," Duffy, 19 Ohio State Law Journal 314.

■ We think the paragraph Fourth, Instruction No. 17, was not erroneous.

(3) Plaintiff, seventeen years old at the time of trial, was sixteen years old and a junior at the Rolla High School when he was injured. He had always been in good health. He was an active participant in high-school activities; he liked to sing, and was a promising high-school athlete. He was a "good mixer." He had his friends. He was strong and rather large for his age; and he had the skill and physical coordination necessary to expertly perform on a trampoline. We have examined an exhibit, newspaper photograph, showing plaintiff, stripped to the waist, exhibiting his skill in trampoline performance to a group of Cub Scouts. The picture shows a youth with finely developed torso and extremities.

Plaintiff's father is in the business of culturing and selling live fishbait to sportsmen, and plaintiff was physically well able to assist his father in lifting and moving the very heavy wooden trays of bait cultures.

Scholastically, in his first two years in high school, plaintiff's grade point average was 1.7, or C minus, but in the "verbal ability" test he was ten percent above the average of his class. The guidance director at the high school said plaintiff certainly was college caliber. "He probably couldn't go to Harvard or Yale, very few can, but a particular college, State College or State University, he would have no trouble in getting in at all." A professor of the school of mines, who is well acquainted with plaintiff, said plaintiff appeared to be a better than average young man, "the kind of person we like to have come to our school, the Missouri School of Mines."

Plaintiff's parents definitely had planned for him to go to college. Plaintiff's mother is a school teacher. And one of plaintiff's sisters is attending the school of mines.

(It was said that, in 1961, the first-year average salary of nontechnical graduates of Washington University was four hundred ninety dollars per month and *the national average was four hundred seventy-six dollars per month.)*

The Pontiac, having been struck by the train, came to rest on its wheels and very close to the curved corner of the curb at the northwest corner of the intersection of 4th and Rolla. Somehow, plaintiff had been thrown from the car and was pressed down between the vehicle and the curb. The unconscious plaintiff having been extricated was taken by ambulance to the Phelps County Hospital in Rolla. Three days later the still unconscious plaintiff was transferred to St. Mary's Hospital at Jefferson City where he remained until the middle of April, 1962, and then was transferred to Jewish Hospital at St. Louis for physical rehabilitation.

Plaintiff had suffered a fracture and dislocation of the spine. The sixth and seventh cervical vertebrae were involved. The cervical vertebrae above the seventh had been thrust forward severing the spinal cord. The injury to this neck portion of the spine and the severance of the spinal cord resulted in complete paralysis of the lower extremities; almost complete paralysis of the upper extremities; inability to control the bladder and bowel, and the lack of sensation in the associated parts.

Because of the fracture, there was a splitting of "the nerve supply right about—almost half way through what is called the brachial plexus, which is the group of nerves that supply the function of your arms, and this left then in this boy some of the nerves that would partially shrug his shoulders, maybe move a few of the muscles along the back of his arm, and perhaps a little bit of a flicker in the fingers, but it eliminates those muscles that bring your hands together or permit you to do anything in the fine control of the hands, in other words, in order to put your fingers to your thumb, for instance, or to pick up something small. You simply don't have the power to do it or the function to do it with."

From the level of the seventh cervical vertebra down and throughout the rest of his body the nerve supply was destroyed. No surgical repair was possible.

While plaintiff was in shock at the Phelps County Hospital, he was put in an oxygen tent to relieve difficulty in respiration. At St. Mary's plaintiff was put in skeletal traction to align the spine and in a Bishop frame to shift body position. He was in skeletal traction six weeks with doctors desperately striving to protect him from fatal infection. He had chills, nausea and a high temperature, all of which the physicians felt were due to inertia, and the loss of the normal functions of the kidney and bladder and imperfect urinal drainage by catheter. Plaintiff lost weight, and his muscles appeared to be wasting away. Several blood transfusions were required. Abnormal matter accumulated in the bladder and, due to the catheter, the urethra became infected. So an incision was made in the super-pubic area to remove the foreign matter which had accumulated in the blad-

der and to accommodate a tube for urinal drainage through the abdomen.

Plaintiff, having been transferred to Jewish Hospital, was soon assigned to the hospital's department of rehabilitation; but full rehabilitation procedures were delayed because of the incidence of decubital ulcers (bed sores), seven of them—one on each hip, three on the lower part of the back, and two on the back of the heels—requiring the excise of the underlying acute protuberances of bone, and the grafting over of "flaps" of cushioning flesh and skin and the final use of plastic-surgery techniques. Also there was an operation necessary in which the tube through the abdomen was removed with closure of the abdominal incision, and the catheter was replaced through the, by then, successfully medicated urethra.

Plaintiff is required to use the catheter and, likely, always will; but an expert medical man testified that, should plaintiff sufficiently recover the use of his upper extremeties as to be able to press his hand down on the lower abdomen or stroke the inside of the thighs, it may be possible for him thus to manually stimulate those nerve reflexes and muscles which cause the voiding of urine.

Because of the delaying surgical procedures mentioned supra, it is only now, at the time of trial, or in a week or so, that the full processes of rehabilitation can be carried on.

A distinguished physician, specialist in the field of physical rehabilitation, made prognosis of plaintiff's physical condition after rehabilitation, and of the medical treatment, hospitalization and nursing service which, in the opinion of the witness, plaintiff will need in the future.

According to the witness, plaintiff will be able to spend the greater part of his time sitting in a chair. He will be able to feed himself with some assistance. He will be able to do some typing, and to go on with his education *(and plaintiff has)*. On the negative side, plaintiff will not be able to walk again. He may learn to get in and out of a chair with the aid of another chair, and into bed with relatively little assistance. He should be able to help with his personal care, such as washing and brushing his teeth. The upper portion of plaintiff's arms are fairly muscular, but he has very little grasp with his hands. All he can do is to hold some relatively small object such as a pencil; but, with "splinting" and other devices, functionally, the arm and hand may improve.

Plaintiff will have to have continuous attention in his home by somebody who will have to be taught the handling of a patient with this type of injury, that is for necessary assistance in personal needs; in getting in and out of bed; in helping him turn over in bed repeatedly during the night; in caring for the catheter; in caring for his bowel elimination, and things of that sort. Plaintiff "should not be left alone for certainly longer than, well, fifteen, twenty, thirty minues, I would think. This may be better as time goes on."

Plaintiff will probably have to have a nurse come to the home once or twice a week to perform some nursing service the lay attendant couldn't do. And patients with this type of injury do well if they return to the hospital once a year for three or four weeks in order that the kidney functions may be evaluated and the patient's general condition can be studied. And a (local) doctor should look in on Ernest at his home once every four or five weeks.

The record supports a finding that the reasonable value of these services is in the aggregate approximately $5,250 per year.

The expert medical witness further said the injury to plaintiff's nervous system would not in and of itself have any tendency to shorten plaintiff's life. But patients with this type of injury "are apt to get complications, and, as I say, complications other than the injury itself, which may shorten" the patient's life. As time goes on, patients, such as the young plain-

tiff, tend to build up immunity to infectuous complications. Although, occasionally, bacteria tend to become resistant to antibiotics, yet medical science discovers more and more new methods and medicines to combat bacteria. It is the general experience that complications become less frequent with the passage of time; and that usually the most serious complications are experienced in the first year.

A witness said that, after an eleven-year study concluded in 1956, it was reported that once a quadraplegic patient (between the ages of fifteen and twenty-four at the time of injury) survives the first year after the injury, there is an eighty percent chance he will be alive eleven years after the injury. A physician said, "This boy with proper nursing care, proper handling, could go for a long, long time." Another said he had no preconceived notion as to the survival of this boy. "The age of the boy suggests to me that he has considerable life expectancy."

Witnesses, an actuary and a specialist in investments, testified the life expectancy of a (male) person seventeen years old in accordance with the U. S. Life Table, 1949–1951, is 52.3 years, that is 48.3 years after the person, a minor, shall have attained the age of twenty-one. It was said the rate of return now obtainable on high-grade diversified securities is 3½% to 4%. An exhibit, prepared by the actuary, sets out the present value of one dollar payable annually throughout each of the series of years until and including the final (48.3) annual payment. The present value of one dollar payable annually throughout the series of years until and including the last (48.3) year of life expectancy is shown to be $20.17 with investments in securities producing a 3½% return, and $18.16 with investments producing a 4% return. These matters, the record shows, were explained to the jury.

The final report, 1960, General Social and Economic Characteristics, U. S. Census of Population, was introduced in evidence and portions of the report were read to the jury, including the following:

"The median annual earnings in 1959 of the male *experienced* labor force in the United States, all over classification 1, were $4,595; professional, managerial and kindred workers, classification 2, was $6,640; and craftsmen, foremen and kindred workers, classification 3, was $5,240. The distribution of earnings within each of the three classifications was, classification 1 (median $4,595), 14.9% earned from $5,000 to $5,999; 10.1% earned from $6,000 to $6,999; 12.2% earned from $7,000 to $9,999; and 7.1% earned $10,000 and over. Classification 2 (median $6,640), 12.1% earned $6,000 to $6,999; 22.9% earned $7,000 to $9,999; and 22.8% earned $10,000 and over. Classification 3 (median $5,240), 19.4% earned $5,000 to $5,999; 15.1% earned $6,000 to $6,999; 16.8% earned $7,000 to $9,999; and 3.4% earned $10,000 and over.

We consider this information is of advisory suggestion in providing the jury with information from which, together with other pertinent evidence, the jury could reason out and determine an approximation of the earning capacity of plaintiff —somewhat as is the mortality table an advisory suggestion in a jury's measurement of a plaintiff's longevity. See Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14.

Was the amount of the verdict excessive?

In reviewing this question, we first shall endeavor to explore the field of the jury's fact-finding province and the factual bases in the record for sustaining the jury's award, especially with regard to the two elements of damages (A) the reasonable value of hospital, medical, nursing and lay attendant care throughout the injured plaintiff's life; and (B) the loss of earnings, or destruction of earning capacity as determined from the factual viewpoint of

what plaintiff would have earned but for the injury.

(A) We have seen there was substantial evidence tending to show the total amount of necessary expense in caring for the injured plaintiff for one year is $5,250, and Frisco does not question the reasonableness of this annual aggregate.

Now, exemplifying, and assuming the jury accepted the investment return of 3½%, and assuming the jury believed from the evidence that the reasonable likelihood is that the injured plaintiff may live only until 1970 (as Frisco asserted the evidence shows in Frisco's argument in support of contended error in paragraph Fourth, Instruction No. 17), that is four years after plaintiff shall have attained the age of twenty-one, it is now said the verdict reasonably includes an award (A) for plaintiff's necessary care throughout those four years in the present-value amount of $16,-800. Again making the above primary assumption of the jury's acceptance of the rate of 3½% investment return, and assuming the jury believed from the evidence the injured plaintiff is likely to live twenty-five years after he attains his majority, it is now said the verdict reasonably includes an amount in present value of something over $75,000 in damages for the element (A).

The jury had for the jury's consideration in determining the element (A) the facts that plaintiff's youth, strength and health enabled him, aided by competent medical care and medication, to survive the initial year after his injury; and the jury had the advantage of medical advice relating to immunizations and to advancements in medical science and new means for combat of pernicious bacteria. We, here, shall not lengthen the discussion of the evidence in this connection, except to say that from our careful look at it we think we see the persuasive lilt of it is up, up, toward the prolongation of plaintiff's life.

In determining the amount the jury did or could have reasonably included in the jury verdict for the element (B), it, of course, is at first noted that plaintiff, a minor, had not established an earnings record. So the jury with respect to the element (B) was obliged to think and reason prospectively from the evidence in order to determine a fairly approximate future fact—the amount of money plaintiff would have earned, but for the injury.

■ "There is and can be no objection to the fact that some material, essential element of a plaintiff's case, or a defense, is not proved by definite, affirmative testimony but is found by the jury's verdict presumably by reasoning or inferring from a fact, or testimony as to a specific subject, or even from circumstantial evidence, that a certain required thing or fact existed or was true." Van Brock v. First National Bank in St. Louis, 349 Mo. 425, 161 S.W.2d 258. See also Wills v. Berberick's Delivery Co., 345 Mo. 616, 134 S.W.2d 125; Vol. 1, Jones, Commentaries on Evidence, (2d Ed.) § 364, p. 628.

In studying the evidence we have set out supra relevant to the issues of element (B), we have noticed evidence tending to show a fact which we can best describe as the "schoolmindedness" of the Coffman family, including plaintiff Ernest. We have noted the schoolteacher mother, the college-girl sister, and the high-school plaintiff who reasonably could not be supposed to ever have become a "drop out," inasmuch as even now, at the time of trial, during rehabilitation, he is going on with his education. Now, we add the testimony tending to show Ernest was of college caliber and that Ernest's parents definitely intended Ernest was to go to college. Here the jury could reasonably believe and draw the conclusion that plaintiff, but for his injury, would have gone to college. And now with this last determined fact in mind, a jury with jurors' common knowledge, observations and experience in school matters could reasonably conclude that, in due course of college events, Ernest, a fair student with better-than-average ability to

express himself, would have had conferred on him a bachelor's degree about the first of June, 1967; now, further, the jury consequently could believe, by referring to information supplied in the record and noticed supra, that plaintiff Ernest with his diploma in his hand could come up with a job paying a salary of something· like $6,000 for the first year after graduation.

We now shall assume that plaintiff's life expectancy, upon attaining his majority, may be considered equal to the life expectancy suggested in the mortality table (48.3 years) and that, in his working life, he would have, through salary increases, earned salary such as would have averaged $6,000 a year throughout his life expectancy; it reasonably is now said plaintiff now has suffered loss of earnings due to his injury, in present value (3½% return on investments) $121,000. In this connection, the jury had information available as to the *experienced* salary earners throughout the United States from which to determine a fairly approximated present-value award compensating plaintiff for what he would have earned, but for his injury.

 Of course, we certainly say the present-value figures mentioned are not the maximum the jury reasonably could have arrived at. The discussion supra is but illustrative exemplification, in this case, of the broad ambit of the jury's thinking and reasoning from the evidence in this case and in making fact decisions in the exercise of the jury's duty as the trier of fact. Even so, we think the discussion demonstrates the jury reasonably could have included in the jury verdict very substantial amounts in damages on the elements (A) and (B).

 Thus far we have neglected to mention the element of pain and suffering, and the element of the distinct permanent personal injuries. Certainly the jury in the jury's discretion reasonably could have found a very large amount in compensation for these elements in this case. Having these additional elements in mind, we now

have the tentative view the jury's verdict in the full amount of the award is justified by the record evidence. This apparently was the trial court's final view, the contended excessiveness of the award having been called to the attention of the trial court by assignment in Frisco's alternative motion for a new trial. We have recently again admonished ourselves that in considering the question of the excessiveness of an award, "we must be mindful not to impinge on the fact finding function of the jury." Honeycutt v. Wabash R. R. Company, Mo. Sup., 337 S.W.2d 50. However, the instant award is large, and in finally answering the difficult question of excessiveness, under our rule of reasonable uniformity we may look for aid by examining other cases involving fairly comparable injuries and in so doing give regard for factual differences, and to the factors involved in the rule and in the doctrine of remittitur.

We accordingly have examined recent cases in which the maximum amounts affording fair compensation for serious personal injuries are large, and we observe that none of the awards in those cases is so large as that in our case. See Myers v. Karchmer, Mo.Sup. (1958), 313 S.W.2d 697, $150,000 reduced by trial court to $100,000; Moore v. Ready Mixed Concrete Co., Mo.Sup. (1959), supra, $200,000 reduced to $150,000 by the trial court; Newman v. St. Louis-San Francisco Railway Company, Mo.Sup. (1963), 369 S.W.2d 583, $225,000 reduced to $135,000; Mantz v. Southwest Freight Lines, Mo.Sup. (1964), 377 S.W.2d 414, $300,000, successive remittiturs in trial court and here, reduced to $200,000.

In viewing the evidence showing the nature of plaintiff Coffman's injury and the facts stated in opinions indicating the nature of injuries sustained by plaintiffs in the above-mentioned cases we see a difference and distinction peculiar and decisive because of the type of injury suffered by plaintiff Coffman. The distinction relates to and affects the element of damages for the permanent personal injury to plaintiff

Coffman and his pain and suffering, and distinct from the elements of damages with which we have treated supra.

This difference, as we say, has to do with the peculiar nature and extent of the injury suffered by plaintiff—this is what the doctors speak of as "this type of injury."

Here we think we cannot correctly and fairly transpose the particular and peculiar injury suffered by plaintiff, a boy seventeen years old, over into the facts of Myers v. Karchmer, supra, and thus see that the damaging effect of the injury suffered by Ernest Coffman would be the same with respect to the aging plaintiff Myers, even though, in the Myers case, the sixth cervical vertebra was fractured with devastating effect on body and mind. Neither could we with fairness decide the effect of the severance of the spinal cord is the same as to plaintiff Coffman as it would have been upon the mentally retarded child, plaintiff Newman. We keep in mind the nature of plaintiff Coffman's injury and its effect on Ernest Coffman, a better-than-average young man who enjoyed visiting with friends, loved sports and liked to sing.

But now, as to the Newman case, if it is true the elements of damages—pain and suffering, expense for care and medication, and the boy Newman's distinct permanent personal injuries make up in damages the aggregate award, $135,000, approved by this court, and if it were reasonable to assume these elements in aggregate damages for Newman's injuries were fairly equal in amount of recovery to plaintiff Coffman's damages for those same elements, then we may say that (since plaintiff Newman, was a mentally retarded boy, suffering epilepsy, who could not have had substantial earning power even if he had not been injured) we should theoretically add (in our case) the Newman approved award of $135,000 *and* an amount reasonably representing the loss of earnings of the plaintiff in our case. It would thus be seen the award in full amount as awarded by the jury in the instant case is reasonably in line with and is supported by the Newman decision. We have found no case in Missouri treating with injury fairly comparable to that suffered by plaintiff Coffman. We have read McCrank v. Great Northern Railway Company, 260 Minn. 329, 109 N.W.2d 582. In that case, as a result of an explosion, plaintiff, a workman fifty-one years old, suffered an injury to his back in which the spinal cord was severed at the junction of the seventh cervical and first dorsal vertebrae causing a complete loss of motor function, control, and sensation below this area. The jury's award of $500,000 was reduced to $325,000.

The bone-crushing, flesh and muscle rending injuries noticed in the Moore and Mantz cases were held to have been totally and permanently disabling considered from the standpoint of prospective earnings, at least, prospective earnings in those endeavors in which plaintiffs Moore and Mantz had theretofore been engaged and were experienced. And their fractured bones, damaged tissues and muscles and dismembered extremities seriously circumscribe the physical power of Moore and Mantz to move about, to care for themselves and to enjoy their share in personal activities, experiences and pleasures. But such residue of body and extremities that "they have left" are sensory, and capable of utilization *from the brain*; this is clearly decisive contrast to the inert, helpless, flaccid, physically and intellectually frustrating plight of plaintiff in our case. For examples, we note the plaintiff Moore, formerly the active police officer, has been needful of a bedpan. But, it is inferred plaintiff Moore has the muscular power activated by nerves emanating basically from and implemented by the brain to retain his urine and elimination of bowel until the necessary improvised urinal and stool, the bedpan, is put into proper position. And we have seen the renowned racing-car driver and promotional genius, Mantz, will have, among other residue of body and limb, a twisted, stiffened and shortened leg; but it is also seen that Mantz can use that leg

**602**

in getting around with the aid of a walking stick, because he can activate what is left of that leg and handle that stick, consciously or subconsciously, with muscles activated by nerve signals from the brain.

We have the opinion the judgment should be affirmed.

It is so ordered.

PER CURIAM.

The foregoing opinion of VAN OSDOL, Sp. C., is adopted as the opinion of the court with this exception, namely, that the court has determined that there should be a remittitur of $50,000; if therefore plaintiff will remit the sum of $50,000 within fifteen days from the date of the filing of this opinion, the judgment will be affirmed as of the date of its rendition for $220,000; otherwise the judgment will be reversed and the cause remanded for a new trial.

All of the Judges concur.