531 F.Supp. 931 (1981)
Weldon Edward PRETRE and Charlotte L. Pretre, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 77-1107C(3).
United States District Court, E. D. Missouri, E. D.
December 1, 1981.
*932 Burton M. Greenberg and Douglas Lee Burdette, St. Louis, Mo., for plaintiffs.
Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., Debra Newman, Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a determination of the amount of damages recoverable by the plaintiffs. The Court having found that plaintiff Weldon Pretre contracted Guillain-Barre Syndrome (GBS) as a result of his swine flu inoculation, the defendant has conceded causation and liability pursuant to the stipulation of the parties. The present issue, therefore, is the amount of all the damages proximately caused by plaintiff Weldon Pretre's inoculation on December 2, 1976. The Court has considered the testimony and exhibits introduced at the second phase of the trial of this matter, as well as the parties' memoranda.
The Court incorporates herein all findings of fact set forth in the Court's memorandum opinion of March 30, 1981, relating to the first phase of this trial, and the Court makes the following additional findings of fact:
During the nearly five-month duration of Mr. Pretre's hospital stay following his inoculation, Mrs. Pretre visited the hospital every day, for about 10 hours daily. She helped care for Mr. Pretre, doing such tasks as helping to feed him, emptying bed pans, and helping with his physical therapy. Following Mr. Pretre's release from the hospital in May, 1977, Mrs. Pretre had to help *933 her husband shower. Mr. Pretre was still reliant upon a walker or a wheelchair at that point. Mrs. Pretre, however, took a job in July of 1977 to help support the family.
Mr. Pretre attended physical therapy after his release from the hospital, initially twice a week. Mr. Pretre no longer needed a walker after approximately August of 1977, although he continued with physical therapy, less frequently, until March of 1978.
Mr. Pretre suffers some permanent effects of his inoculation. The muscle strength in his arms has recovered to the level of an average man's, although not to the level of his own muscle strength before December, 1976. He has less than normal feeling in his fingertips, which causes him to fumble when handling very small objects. He also has less sensation in his feet, especially his toes, than is normal. He has a tic in his lower left eyelid, his right eye tears occasionally, and he experiences occasional numbness of the right upper and lower lip, which may cause him to drool. In sum, Mr. Pretre suffers mild sensory residuals of GBS. These neurological residuals are permanent.
Mr. Pretre's major physical problem, however, is his post-phlebitic syndrome, or bilateral chronic venous insufficiency. This is also a permanent condition, in which his deep venous system is not properly returning the blood to his heart, so that there is a backup of blood in the legs. The result of this condition, in Mr. Pretre's case, is that his legs swell when he has been in a standing or normal sitting position for any length of time. The swelling causes discomfort and pain. It has also resulted in a bronze discoloration of his lower legs. The condition renders him more susceptible to leg ulcers. Mr. Pretre must elevate his legs a minimum of three times daily, up to eight times daily, for at least twenty minutes each period, depending on the extent of the swelling.
Although his gait is normal if he walks slowly, he limps slightly if he walks at normal pace. His legs fatigue more easily, and he may require a cane if he walks a great deal. Mr. Pretre's current practice is to elevate his legs about half of his waking hours. He can drive a car, and he does go to the grocery store, to the post office, and on similar errands, but if he attempts four such errands in a day, he experiences pain and swelling in his legs at night. Although the swelling is somewhat less in the morning than it is at night, he had edema of 2 + on a scale of 0 (no edema) to 4 (most severe edema) at 11:00 a. m. during an examination in June, 1981. Mr. Pretre's exercise is limited to walking, and he will not be able to participate in most of the sports he formerly enjoyed.
Mr. Pretre is being treated with the following medications: coumadin (a blood thinner), tranxene, lasix, dilantin, and elavil. He will continue to have to see his physician every two to three months.
Mr. Pretre began seeing a psychiatrist, Dr. Manglesdorf, in July of 1978. His primary complaint was impotence. Dr. Manglesdorf noted in May of 1979 that whereas the plaintiffs, prior to Mr. Pretre's inoculation, had enjoyed sexual relations about four times a week, they were having relations only twice monthly. Dr. Manglesdorf administered Mr. Pretre a Quick Intelligence Test, and determined that Mr. Pretre's intelligence is in the low normal range. Mr. Pretre's last visit to Dr. Manglesdorf was in May, 1980, just over a year prior to the damages phase of this trial.
Mr. Pretre's outward appearance is not that of a disabled man. Nevertheless, in view of the facts that nearly all of Mr. Pretre's former occupations required hard physical labor, that Mr. Pretre has only an eighth grade education, and that the disabilities described above are of a permanent nature, the Court finds that Mr. Pretre is permanently disabled. The Court's finding in this regard is based on physical disabilities alone, not on any depression Mr. Pretre may be experiencing, which, however real, is not of such a degree that it would interfere with employment. However, the Court finds that the evidence did not show that Mr. Pretre will be unable to do odd *934 jobs around the house, such as auto repair, carpentry, and painting. Mr. Pretre will be able to stop as often as he may need to in the course of these endeavours to elevate his feet.
Missouri law governs the nature of damages recoverable by the plaintiffs, because Mr. Pretre's inoculation occurred in Missouri. Overton v. United States, 619 F.2d 1299, 1305 n. 5 (8th Cir. 1980); 28 U.S.C. § 1346(b). However, punitive damages are not recoverable, pursuant to 28 U.S.C. § 2674. In determining the proper amount of damages under Missouri law, the Court may consider such factors as the plaintiff's age and educational level, the nature and permanency of the injuries, diminished working and earning capacity, changing economic factors, and the amount of pain and suffering. Koehler v. Burlington Northern, Inc., 573 S.W.2d 938, 945 (Mo. App.1978). Mental anguish attendant upon bodily injuries is a compensable injury. Mullendore v. Gentry, 377 S.W.2d 494, 497 (Mo.App.1964). Permanent injury is a factor independent of pain and suffering, Slusher v. United Electric Coal Companies, 456 S.W.2d 339 (Mo.1970); however, the permanency of injuries may not be found on the basis of conjecture, likelihood or even probability. Simmons v. Jones, 361 S.W.2d 860, 862 (Mo.App.1962). Plaintiffs may also recover, of course, for medical and hospital expenses, directly caused by Mr. Pretre's inoculation, which have been incurred and which are reasonably certain to be incurred in the future, to the extent of the reasonable value of such expenses. Wilcox v. Swenson, 324 S.W.2d 664, 672-73 (Mo.1959).
Missouri law allows recovery for Mrs. Pretre on her claim of loss of consortium. "Consortium ... includes in addition to material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualist unity." Helming v. Dulle, 441 S.W.2d 350, 354 (Mo.1969) (quoting Hodges v. Johnson, 417 S.W.2d 685 (Mo.App.1967)). The damages suffered by Mrs. Pretre require independent consideration of those suffered by Mr. Pretre. Stalheber v. American Cyanamid Company, 451 S.W.2d 48, 64 (Mo.1970).
Turning first to the question of Mr. Pretre's medical and hospital expenses, the Court notes that Mr. Pretre was billed $1,187.00 by Dr. Manglesdorf, the psychiatrist; $25,743.62 by St. John's Hospital for the initial hospitalization and therapy afterwards; $2,824.00 by Dr. Bonsanti; $530.00 by Dr. Weiss; and $1,579.09 for the second hospitalization at St. John's for dental work.[1] In addition, he paid $887.01 for medication between May 21, 1977 and May of 1981 and for initial wheelchair and walker rental. These total $32,750.72. The Court finds that these expenses were reasonable, directly caused by Mr. Pretre's inoculation, and recoverable by him.
As for future medical expenses, the Court finds that at current rates they would average $350.00 yearly ($150/year for five visits to Dr. Bonsanti, with necessary tests; $200/year for medicine). The Court does not believe that future psychiatric expenses have been proven. Therefore, the Court will award Mr. Pretre $8,465.45 for his future medical expenses, based on an annual cost increase of 9% and a discount rate of 9.5%, as indicated by the testimony of Dr. Grossman at trial.
Mr. Pretre must also be compensated for his lost wages and diminished working and earning capacity. Mr. Pretre has not returned to work since December 24, 1976. Mr. Pretre's federal income tax returns show that his gross income at Ford was $25,454.88 in 1976; in 1975 it was $22,361.44; in 1974 it was $25,605.51; in 1973 it was $25,249.87; and in 1972, it was $18,025.31. However, a large percentage of that income was overtime income, as Mr. Pretre's personnel file at Ford indicates that, from January of 1972, his monthly base salary was as follows:

*935
 January 1, 1972 - $1,167.00
 April 16, 1972 - 1,272.00
 December 1, 1972 - 1,310.16
 September 16, 1973 - 1,375.66
 December 1, 1973 - 1,436.34
 October 1, 1974 - 1,479.44
 December 16, 1974 - 1,576.00
 October 1, 1975 - 1,623.28
 October 16, 1976 - 1,700.90.

These figures equal yearly base salaries, and indicate corresponding amounts of overtime, in the following amounts:

 Base Salary Overtime Salary
 1972 $14,934.66 $3,090.65
 1973 16,011.85 9,238.02
 1974 17,413.66 8,191.85
 1975 19,053.84 3,307.60
 1976 19,673.41 5,781.47

In addition, starting with the base salary of April 16, 1972, when Mr. Pretre was promoted to a Grade 7, his percentages of annual increase in yearly base salary were as follows:

 increase from 1972 to 1973 - .045
 from 1973 to 1974 - .087
 from 1974 to 1975 - .094
 from 1975 to 1976 - .032.

This averages a yearly increase of 6.5%. In light of these figures, the Court must reject Dr. Grossman's estimate of the income lost by plaintiff in the years 1977-1981. That estimate was based on a Wage Index Factor which took 1976 as the year zero and measured the percentage rise in all manufacturing production wages in comparison with that year. The percentage rise ran about 9%. "Trending" of past wage loss is acceptable "when closely based upon plaintiff's prior employment history," and subsequent wage gains for his position. Sampson v. Missouri Pacific Railroad, 560 S.W.2d 573, 588-89 (Mo.1978) (en banc). The Wage Index Factor used by Dr. Grossman is not based solely on the automotive industry, is not related to plaintiff's position after 1976, and does not comport with plaintiff's salary levels in years prior to 1977.
The Court finds that, in order to compensate Mr. Pretre for past lost wages, the Court must provide Mr. Pretre an annual base salary increase of 6.5% since 1976, plus overtime at an average of the overtime earned in 1972 through 1976, also increased at 6.5% annually. However, the Court's award of overtime will end in March, 1979, because it was established at trial that overtime has been minute since that time. It would be pure speculation to assume that overtime will resume at some point in the future.
Hence, the Court finds that Mr. Pretre has lost the following wages:

 Base Salary Overtime
 1977 $20,952.18 $ 6,306.84
 1978 22,314.07 6,716.78
 1979 23,764.48 1,788.34
 1980 25,309.18
 1981 13,477.13
 (half of
 year)
 ___________ __________
 $105,817.04 $14,811.96
 TOTAL: $120,629.00

This total is a pre-tax figure. Consequently, it must be reduced by 20%, which, according to Dr. Grossman, was plaintiff's average annual tax in the years 1972 through 1976. Eighty percent of $120,629.00 is $96,503.20, and the Court will award that sum to Mr. Pretre for lost wages. Although it was established at trial that Mr. Pretre would have been laid off by Ford, due to his seniority date, in May, 1980, when production was halved, the Court finds that the plaintiff would have sought similar work. Mr. Pretre must be compensated for the loss of his earning capacity, not merely for the loss of income from any particular job.
Turning to plaintiff's claim for loss of capacity to earn in the future, the proper measure is "the difference viewed as of the time of trial between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm." Sampson, supra, 560 S.W.2d at 589 (quoting Coffman v. St. Louis-San Francisco Railway Co., 378 S.W.2d 583 (Mo.1964)). A figure for loss of future wages must be based on substantial evidence and must be established with reasonable certainty. Id. Dr. Grossman's estimates as to plaintiff's future wage loss are based on a "current," i.e., a 1981, gross *936 income of $37,910.00 as deduced from the use of the Wage Index Factor previously mentioned. The Court must reject Dr. Grossman's estimate of future losses not only because it is based on a figure derived from the Wage Index Factor but because it is also derived from Mr. Pretre's total salary in 1976, which included a large amount of overtime salary.
Instead, the Court will award Mr. Pretre the sum of $306,933.80 for the present value of the loss of earning capacity. This figure is derived from the use of a "current", i.e., average of 1981 and 1982,[2] after tax income of $22,264.22 (assuming again a 20% tax rate); an annual increase of 6.5%; a discount rate of 9.5% (the rate for interest free municipal bonds) and a future earning span of 19.2 years.
Mr. Pretre must be compensated for the pain and suffering, both physical and mental, that he has endured as a result of his inoculation. While GBS itself is not an especially painful disease, it understandably caused Mr. Pretre a great deal of mental suffering and anguish about his health. After he developed thrombophlebitis in February of 1977, he experienced a much greater degree of physical pain. This was the direct result of his inoculation. For the pain and suffering, physical and mental, during the period of his hospitalization, the Court will award Mr. Pretre $15,000.00. For the following three months, when Mr. Pretre was yet dependent on a walker or a wheelchair and struggling to regain his mobility, the Court will award him $3,000.00. For the period between September, 1977 and March, 1978, in which Mr. Pretre continued to require physical therapy about once a month, the Court will award Mr. Pretre $5,250.00.
The Court finds that plaintiff's current condition and disabilities need not be painful for the plaintiff, if he elevates his legs whenever needed, except after unusual exertion, which it is within plaintiff's power to control. Therefore, the Court will award Mr. Pretre the sum of $31,000.00 for pain and suffering in the period from March, 1978, for the remainder of Mr. Pretre's life expectancy of 73.6 years.
Finally, the Court believes that an award of $85,000.00 is necessary to compensate Mr. Pretre for his disabilities and their effects. The disabilities have been shown, with more than reasonable certainty, to be permanent. Mr. Pretre's range of activities has been sharply curtailed. For a man accustomed to enjoying numerous sports, it is undoubtedly very frustrating to be in Mr. Pretre's condition. Mr. Pretre's physical relationship, and to some extent, his emotional relationship with his wife have undergone changes for the worse. Their social life has been restricted in some respects, as they cannot participate in sports together. The Court finds that $85,000.00 is necessary to compensate Mr. Pretre for these unfortunate effects of his permanent physical disabilities, apart from the actual pain his injuries may cause.
The Court turns to a consideration of Mrs. Pretre's claim for loss of society. The Court does not believe that it is appropriate to award Mrs. Pretre pay at the rate prevailing for a nurse's aid during the time she spent with her husband in the hospital. Although she may have done many tasks for her husband, the Court finds that these were done out of the extra measure of devotion that may be expected of a spouse, to provide care beyond the level of adequate nursing care. To award Mrs. Pretre the wages of a nurse's aid for the period she spent in the hospital would amount to a finding that the nursing care provided by St. John's Mercy Medical Center was inadequate, and thus that the rates charged by St. John's were not reasonable.
However, this is not to say that Mrs. Pretre has not been forced to shoulder heavy burdens as a result of Mr. Pretre's illness and physical condition, both during and after his hospitalization. She was totally deprived of his emotional and physical *937 support in their home for five months. She bore the emotional and physical burdens placed upon her by Mr. Pretre's weakness following his discharge from the hospital. She has been forced to return to work. She has lost the degree of physical intimacy with her husband which both enjoyed before December, 1976, and she has had to accept a curtailment in their social activities. Mr. Pretre's physical condition and inability to support his family has added an extra strain to the whole of the plaintiffs' marital relationship. For all of these reasons, the Court finds appropriate an award of $75,000.00 to Mrs. Pretre.
In accordance with the foregoing, the Court will enter judgment for plaintiff Weldon Edward Pretre in the amount of $583,903.17 and for plaintiff Charlotte Pretre in the amount of $75,000.00.
NOTES
[1] Hospitalization was necessary because Mr. Pretre had to be taken off one blood thinner and changed to a different type.
[2] The average figure is used because the first year of the future earning span of 19.2 years is comprised of the last half of 1981 and the first half of 1982.